The opinion of the court was delivered by
DeBlanc, J.
Michael Dickson died in the parish of Bossier on the-30th of March, 1865, leaving seven children born of his marriage-with Hanna P. Palmer, his surviving widow, to wit:
1. M. A. Dickson, now dead, and represented by four minors, who-are under the tutorship of their mother, Mattie Lipscombe.
2. Mary E. Dickson, the wife, by a first marriage, of J. B. Trigg,, and — by her seco,nd marriage — of General Gideon Pillow, of Tennessee..
3. Victoria H. Dickson, the wife of Captain S. M. Thomas.
4. Emma Dickson, the wife of R. McDowell.
5. Lizzie Dickson.
6. M. Hugh Dickson.
7. Palmer Dickson.
In 1871, Olympe Boisse — the plaintiff — obtained against the said' Mary E. Dickson, in the Circuit Court of the United States, sitting at. New Orleané, a judgment for $4231.40, with interest. In 1872, on the-9th of February, this judgment was recorded in the parish of Bossier,, where the succession of Michael Dickson is opened.
Under an alias writ of ft. fa., issued on the judgment thus obtained, and recorded, a deputy marshal seized — as alleged in his return — “ all the right, title, interest, claim and. demand of the said Mary E. Triggin and to the succession of her father, Michael Dickson, the same being-the undivided one seventh interest in all the movables, immovables, rights and credits belonging to and composing said succession.”
This seizure was made on the 12th of May, 1873, more than eight years after the death of Michael Dickson, fifteen months and three days after plaintiff’s judgment had been recorded in the parish of Bossier.
What — under the alias writ and the assumed seizure, did the deputy-marshal advertise for sale ? “ All the right, title, interest and demand of Mary E. Trigg as an heir in and to the succession of her father* *743 Michael Dickson; said right, title, interest and demand being the undivided one seventh interest in and to the property, as found in the inventories of said succession, on file and of record in the parish of Bossier.” This recital in the advertisement is followed by a long and descriptive list of the property mentioned by the deputy marshal “ as found in the inventories of said succession.”
We know what the deputy marshal alleges that he has seized; we know what he has advertised for sale. After that seizure and that advertisement, what did he sell, what did he adjudicate to ^plaintiff? In his-own words: “the property heretofore seized under the writs.” In the deed from the marshal to Olympe Boisse, he refers' to the property so seized and adjudicated, as that described in the inventories of the succession, and — in that deed — he transferred to said adjudicatee, Mrs. Trigg’s undivided interest in and to the property referred to by him.
As transferree of that interest, plaintiff applied to the parish court of Bossier to compel the widow of Michael Dickson to render an account of her administration of said deceased’s succession, and to give— as usufructuary — the security which — she alleges — is required by law.
Mrs. Mary E. Trigg, through a curator, and the other heirs of Michael Dickson, by the usual citations, were made parties to plaintiff’s suits against the aforesaid widow and administratrix.
On the 7th of February, 1876, the widow excepted to plaintiffs action, on the ground that the sale from the marshal to her is an absolute nullity, because at the date of, and long anterior to said sale, Mrs. Trigg had applied for a discharge in bankruptcy, and — by order of a competent court — all proceedings against her person and property were stayed.
This exception was referred to the merits, and Mrs. Widow Dickson, her daughters Emma and Lizzie, and the curator appointed to Mrs. Pillow, filed an answer in which they deny:
1. That at the date of the sale from the marshal to plaintiff, Mary E. Trigg had any interest in the succession of her father.
2. That under said sale, Olympe Boisse acquired any right authorizing her to demand and require an account of the administration of said estate.
The validity of the sale from the marshal to plaintiff is also disputed on the ground that, even if Mrs. Pillow had not then received more than her share of her father’s succession, no legal seizure was made or attempted to be made of said share.
In addition to these grounds, Mrs. Dickson contends that, as plaintiff’s action is for one seventh of the succession of Michael Dickson, of which she holds possession, and to the usufruct of which she is entitled during her life, and as that seventh interest is worth more than *744 five hundred dollars, she can be disturbed in her possession, but by an action before the District Court; and that — as to this controversy — the parish court was without jurisdiction ratione materice and ratione personas.
These exceptions and defences were not sustained by the lower, court, and Mrs. Dickson ordered to render an account of her administration. In accordance with that order, she filed an account in which she charges herself with the value of the personal property belonging to the community which heretofore existed between her and her late
husband...............................................$45,198.50 and claims for debts paid by her and for which said community
was liable, a deduction of................................$28,812.42 leaving subject to her own right as a partner in the oommu---nity, and as usufructuary, a balance of...................$16,386.08
In the petition to which her account is attached, she alleges thatshe has paid, in addition to the debts carried in said account, large claims due by the aforesaid community, the amounts of which she was unable to ascertain within the time allowed her for a compliance with the order of the court.
She avers — besides—that, up to 1872, the succession of Michael Dickson has paid for and advanced to Mary E. Trigg, in cash, $29,999.74— in kind, two hundred bales of cotton, valued at ten thousand dollars, and which — according to the evidence — were worth and brought more than twice their alleged value.
Hugh and Palmer Dickson, two of the heirs of the deceased, without acknowledging plaintiff’s right to the share of their sister in their parent’s estate, joined in her opposition to their mother’s account, and they pray — with plaiptiff — that their mother be charged with $125,000, the presumed proceeds of sales of cotton, and, in addition, with $274,450, for property received, used and disposed of by her, and which —they state — belonged to the succession of her husband.
Plaintiff’s action is neither the petitory, nor the possessory action. She is not seeking the recognition of a disputed title, the recovery of a contested possession, the immediate enforcement of a claim now demandable. She is simply asking, of the administratrix of the succes- ' sion of Michael Dickson, to place on record the evidence of what the deceased has left, what has become of the property which has passed under her control as administratrix, what she has paid for her husband’s succession or the community, what she holds as usufructuary, a settlement of their respective rights in an unsettled community and unsettled succession. To that extent, her action is essentially of a probate character, and to that extent was properly sustained.
Michael Dickson died rich: his children were educated partly in *745 the United States and partly in Europe; they may still be, but — at his death — they certainly were closely united among themselves, trusted in each other and trusted in their mother. They then believed and had reasons to believe that the fortune inherited and acquired by their parents was amply sufficient for his widow and heirs. That fact, which not only retarded, but prevented a settlement between them, is fully established by the uncontradicted declaration that “ on consultation with the family, the opening of the succession of Michael Dickson was opposed, on the ground that they desired the property and family to remain as their father had left them.”
The succession was thereafter opened, but only on representation that it was indispensable for the purpose of authorizing some one to pay its debts, collect what was due to it, and more particularly to have ginned, baled, shipped, and sold the cotton on hand. In conformity with that representation, Mrs. Dickson was appointed as administratrix of said succession, in the month of September, 1865 ; inventories were taken of its property and assets, and Oapt. Thomas chosen by the administratrix to act as her agent.
That agent prepared the cotton for market and shipped it to New Orleans. There, from the 23d of February, 1866, to the 24th of February, 1868, eight hundred and forty-one bales were sold as belonging to the estate of Michael Dickson, for $87,593.94. A member of the commercial firm by whom it was sold testifies that the United States Revenue tax thereon must have aggregated the sum of $7500. That other and additional costs were incurred, there can be no doubt, for a lot of said cotton was seized by federal officers assisted by federal soldiers, and that seizure must have entailed on the interested parties serious troubles and expenses. Those costs and expenses constitute a charge against the proceeds of the sales of the cotton.
After the death of her father, and before the appointment of her mother as administratrix, Mrs. Mary E. Trigg took from one of the plantations two hundred bales of cotton, which were seized in New Orleans by an agent of. the United States; of the lot thus seized — said agent consented to release one hundred and eighty-eight bales, which were afterwards sold, for account of Mrs. Trigg, by A. F. Dunbar & Co. From that sale she realized, after payment of all charges, the sum of $19,526.60, which — added to the advances and payments made to and for her, $29,999.74, gives a total of $49,526.34, received by her from her father’s succession, before plaintiff had obtained a judgment against her, before the seizure by plaintiff of her hereditary rights, and — as a matter of course — before plaintiff had acquired any title to her share in her parent’s succession.
Three of the defendants, besides Mrs. Trigg, contend that the title *746 relied upon by plaintiff is an absolute nullity. If it were, plaintiff replies, it is derived from the execution of a judgment rendered by a federal court, and its validity cannot be inquired into either by or before a State tribunal. In this, she is certainly mistaken. That judgment is not binding on those who were not parties to it, and — as it is made the basis of her action, its validity may-collaterally be inquired into, as— otherwise — the State tribunal would have had to suspend its proceedings, in order to await the trial by and adjudication of the federal court on-only one of the branches of an entire litigation.
In this case, which of the two tribunals has cognizance of the-subject matter? It is not the federal, it is the State court, and that court alone can, legally, pass upon and determine every branch, every incident of this controversy. This is indisputable. Plaintiff claims under a seizure by, and a sale from the marshal. Defendants deny the fact of this seizure, the validity of the sale. Must that fraction of the suit be dissevered from the main action, and submitted to the Circuit Court of the United States ? Such a construction would destroy the indivisibility of the action, and compel a strange retailing by courts of dissimilar jurisdictions, of separate decisions on distinct branches of an indivisible suit. This position is not sustained by any law, any jurisprudence.
8 L. R. 459. 11 L. R. 384, 390.
Is the title from the United States marshal to Olympe Boisse a valid title? Several of the defendants contest both its validity and its existence. They allege that, on the 21 of August 1873, the day mentioned in the return on the writ as that on which Mrs. Trigg’s interest in her father’s estate was adjudicated to plaintiff, the marshal had no writ in his hands, and was without authority to sell. This objection is not-supported by the evidence adduced on the trial: the federal officers proceeded under a writ regular in substance and in form. '
Did the officers of the federal court make a legal seizure of the rights adjudicated to plaintiff? On the first perusal of their proceedings, the impression left on the mind is that they did not. Their return certifies that one of them “ seized and took into possession the title, interest, claim and demand of Mrs. Trigg, in and to the succession of her father, the same being the one undivided seventh in all the movables, immovables, rights and credits belonging to and composing said succession.”
In their advertisement of the sale, they added to that description that the interest so seized was “ Mrs. Trigg’s interest in and to the property as found in the inventories of the succession of Michael Dickson, on file and of record in the parish of Bossier,” and then gave a complete list of every article of property and every right included in said inventories. In the deed from the marshal to plaintiff, he transferred to *747 her “ Mrs. Trigg’s interest in the property heretofore seized under the writ, and described in said inventories.”
There was no actual seizure of any specific property, no seizure of either land, mules, cattle, corn, bacon or fodder, which at that time had partly perished or been disposed of, but a seizure of Mrs. Trigg’s interest in her parent’s estate, and that interest was not, could not have been, as-stated by the deputy marshal, reduced to possession. Does that inconsiderate statement vitiate the advertisement and the sale ? It does not. Had it been omitted, were it now stricken out, and disregarding it — as we do — the fact remains “ that Mrs. Trigg’s inheritance was seized, advertised for sale and sold.”
To give to the public and to the bidders a clue to the value of the-property seized and advertised for sale, it was proper to publish a list of said property, to mention the nature of the rights, interest, claims and demands which had been levied upon. An inheritance consists, not only of rights, but of liabilities, and — as far as practicable — when an inheritance is seized- — the amount of its liabilities should be ascertained and' announced, in order to assist in its appraisement, warn purchasers, and', realize its value.
4 A. 295.
The creditor can and should seize the entire interest of the heir in-the succession: but can he seize what the heir has previously disposed' of, what has passed to third parties, what has ceased to exist ? Can-that creditor, more than eight years after the opening of the succession, proceed to seize, sell, buy and claim — in whatever hands they may be— every article of property, every one of the rights which composed the succession, when it was opened ? He cannot.
In support of that unreasonable proposition, we are referred to the decision of this' court in the celebrated ease of Yirginie Ternant against Evariste Boudreau — 6 R. R. p. 488 — in which it was held that, because Ternant had purchased Boudreau’s interest in the succession of DorotheaLegros, the wife of the first, the mother of the other, Ternant, by virtue of that sale, was entitled to diamonds and ornaments of gold, which had been deposited in the coffin which contained the remains of the wife- and mother, when those diamonds and ornaments were recovered irons the felons who had desecrated the tomb and robbed from the coffin. •
- Between plaintiff’s case and that relied upon by her counsel, there-is a marked difference. Boudreau sold at private sale, immediately after the death of his mother. Imagining that the planks of the coffin, •the wall of the tomb, excluded from his contract what he and Ternant had therein deposited, or rather not thinking at all of the jewels which— under their own instructions — were sealed against the effects of any contract, he sold — without exception — his hereditary rights in his *748 mother’s succession. Those of Mrs. Trigg in her father’s estate, were seized when ? More than eight years after the death of her father, more than eight years after she had acquired the power of disposing of her inheritance, more than eight years after she had taken and disposed of at least a considerable portion of that inheritance.
Here, we are told by counsel that “ a succession is an immovable, and that — to affect third parties — the transfer of a share in a succession must be made by a written act, recorded as the law prescribes.” This is an extraordinary mistake, which in the whole course of our own jurisprudence, is sustained by only one, a dissenting opinion, which stands almost unnoticed in our esteemed reports. The action to recover an entire succession is classed, in our Code, as an immovable action, from the object to which it applies — but the succession, as such, is not an immovable. “ If it were,” as remarked by Mr. Justice Spofford, “ if we could disregard the elements which enter into its composition, we should be forced to the conclusion that, when it is entirely composed of personal effects — not one of which could be separately mortgaged— ■the heir could yet mortgage the ideal being representing those effects.”
12 A. p. 684.
That construction is sanctioned by the letter and spirit of our legislation : it provides that "tutors of minors and curators of persons interdicted have the right to institute in their names suits for the partition of the effects of successions, whether movable or immovable, falling to said minors or interdicted persons.” In the English text, the qualification “ movable and immovable ” might be applied to the word “ effects.” 'The French text repels such an interpretation ; “ les tuteurs des mineurs et les curateurs des interdits ont le droit de provoquer, en leur noms, le partage des successions — soil mobilibres, soit immobilieres, auxquelles ■ces mineurs ou interdits sont appelés.”
Code of 1825, Article 1235.
“Ainsi — said Marcadé — que l’on entende par action la rédamation méme, la demande en justice — ce qui est exact — soit que l’on entende le droit d’obtenir jugement et résultant de la reclamation, ce qui serait inexact, on n’arrivera jamais a trouver, dans Faction, un bien spécial et distinct du droit qui a engendré cette action, et sur lequel le jugement' a prononcó ou doit prononcer. L’action ne peut pas étre un autre bien que le droit qui la produit.” ' '
Marcadé, Yol. 2, p. 361.
As long as a succession remains opened and undivided, as long as it does not cease to be a succession, before its acceptance, or during a litigation — between contending parties — as to whom it shall descend, a succession is an entirety. The creditors of those to whom it fell, can and should seize, before the partition, not the separate interest of their *749 debtors in any separate article oí property, but tbeir undivided share of the entirety, their inheritance, with its rights and its liabilities. When the title to the succession is not disputed, as soon as it is accepted, either expressly or impliedly, the succession disappears and the co-heirs become co-proprietors of movables and immovables.
In the case already cited by us, Chief Justice Merrick held “that when the heir is present and recognized, or when the creditors have accepted the succession for him by the seizure of his interest in it, the succession — even if it be under administration — must be considered as in possession of the heir.” At the death of Michael Dickson, Mrs. Trigg was present, recognized as one of his heirs, accepted his succession, tacitly at least, and disposed — if not of the whole — of a considerable portion of her share in the same, and this, several years before plaintiff’s debt had accrued against her.
In vain would it be contended that plaintiff’s right to inquire into and annul any real transaction between Mrs. Trigg and her parents, accrued before plaintiff became a creditor of Mrs. Trigg, before the surviving parent was legally informed — by the seizure or otherwise — of the existence of appellant’s claim, and Mrs. Widow Dickson should have been allowed to prove what she has paid to, what was taken and received by her daughter from the estate of her father before the seizure of her daughter’s inheritance.
As urged by plaintiff’s counsel, from the date of her husband’s death, Mrs. Dickson was entitled to the usufruct of his share in the community of acquets and gains; but, when did she claim and exercise the right to which she was thus entitled? Was it at the death of her husband ? It was not — for, then, the mutual understanding, the expressed intention of the mother and the children, was that the property should continue to be held in common between them, “ that property and family should remain as the father had left them.” Under that understanding, the heirs of age took and were allowed what they wished, the minors were sent to school, first in the State, afterwards in Europe.
In an instrument attached to one of the many bills of exception which swell the record, Mrs. Trigg acknowledged — on the 10th of Jan.uary, 1867, that she had settled with her mother for her rights in her father’s estate, and that she had been paid in full for her interest as an heir. In regard to plaintiff — as a third party — this instrument was not —of itself — an absolute proof of the verity of its naked and unsworn statements; but — coupled with the evidence which the widow attempted to adduce to support its contents, it was relevant to, and an important part of the proof authorized by the issues presented. It was not the evidence of a transfer of any incorporeal right, of any personal or real property, but an acknowledgment, by Mrs. Trigg, that she had received, *750 in cash, in kind, in some way, an amount which was, or which she considered equal to her share in the succession of Michael Dickson, and— for that legitimate purpose, it should have been admitted' by the lower •court.
Plaintiff’s counsel objected on the trial, to the testimony of Oapt. S. M. Thomas, the husband of one of the heirs. It is true that he could not have been called upon to testify for or against the interest of his wife, but he could certainly testify for or against the interest of the mother, sisters and brothers of his wife, for or against the creditor of Mrs. Trigg, and — so far as concerns Mrs. Dickson and plaintiff, the only (parties who can claim, in this court, the maintenance, reversal or amendment of the judgment appealed from, his testimony was properly received.
When she submitted to the court her account as administratrix of her husband’s succession, Mrs. Widow Dickson reserved the right to -thereafter show that she had expended and paid, for said estate, large .amounts not included in said account, and her reservation was sanctioned by the decree appealed from. This was irregular. If Mrs. Diek■son was unable to ascertain, within the delay fixed by the judge, the amount of those expenses and payments, she should have applied for and been allowed an additional delay to procure that necessary information. We can not, however, deprive her of the right so reserved.
In this case, the only appellant is Olympe B\ isse: all the other parties are appellees — and, as between the latter, the decree of the lower •court can neither be revised, amended or reversed. Eor that reason, it is useless to discuss, in detail, the balance of the bill of exception: for the purpose of the revision of the only branch of this controversy which we can determine, they are virtually decided by the views already expressed.
We are unable to concur with the parish judge in all of his conclusions. He held that Mrs. Widow Dickson is chargeable with the whole of the property of the succession, which — he considers — was left in her possession at the death of her husband. It is shown that at that time — by consent of the interested parties — the whole of said property remained, as common property, in the possession of the widow and of the heirs of age — and, since then — where is it? It partly passed, and for a nominal price — in the possession of the children who have coalesced with plaintiff, in her action against their mother.
The evidence does not support the assertion that Mrs. Widow Dick•son disposed of twelve hundred bales of cotton belonging to the community, and that she was liable for their value, fixed by the lower court at one hundred and thirty-eight thousand dollars. Of the cotton raised during the war on the three plantations — less that which was stolen, *751 contributed to the Confederate government, or taken by Mrs. Trigg— every bale was shipped to the city, and consigned to only one commission house — there sold for account of the estate of Michael Dickson, and every cent of the proceeds of the sale carried to the credit of said estate. Does not this important fact corroborate the declaration “ that •the family and property were to remain as the father had left them ? ”
As regards said cotton, its value and the number of bales shipped and disposed of, Mrs. Dickson’s liability — either as administratrix or usufructuary — is fixed, not by the doubtful estimates made several years after the sale and at hundreds of miles from the market to which it was .sent, but by the best, the most satisfactory evidence — the account rend-1 «red by the commission house to which it was consigned and by whom it was sold. If any more was raised, ginned, baled, shipped and sold, how imagine that the heirs or the creditor would have failed to discover ?
When, after the days of abundance and luxury, the expensive excursions at the North and in Europe, the brilliant and costly festivities of the city, trouble and anxiety crossed the threshold of the home filled— until then — with all that fashion commanded and gold could procure, when the last check was drawn on the last fund, Mrs. Dickson who had been parsimonious but to her and prodigal towards her children, remained — according to the evidence — what she seems to have ever been, an affectionate mother. To her sons Palmer and Hugh, she gave what they asked : they proposed to lease one half of one of the plantations. She leased it to them for five years, at the rate of fifty dollars per annum, and — on the trial — offered to prove, by one of the lessees, that said rent was worth fifty times the price agreed upon.
This, she was not allowed to do : but, as neither she nor her children appealed, it is useless to decide whether that evidence was properly or improperly rejected. We refer to it only so far as it bears on that branch of the controversy which is before us, as a presumption that Mrs. Dickson was not disposed to favor any one of her children to the detriment of the others, and that — at a period of distress and need — she was striving to do for the youngest what, in time of affluence and prosperity, she has done for Mrs. Trigg.
The cotton and funds left at the death of Michael Dickson, did not —at that date — pass into the exclusive possession and become the absolute property of the widow, as usufructuary, but — by mutual agreement — remained, until they were disposed of and exhausted, in possession of the widow and heirs, and if — at the date of plaintiff’s seizure — Mrs. Trigg had already taken her share of said cotton and funds, her creditor can not justly expect to be allowed to again exercise an extinguished, a satisfied right. If — as alleged — she took more than her share, she is liable — for the excess — to her mother and co-heirs, and *752 not, as urged, to her mother alone. If, at the end of her mother’s usufruct, there remains unsettled and unsatisfied any portion of Mrs. Trigg’s inheritance from her father’s estate, that portion, with its charges— whatever they may be, shall — at that date — pass to plaintiff, as.Mrs. Trigg’s assignee.
We can not assume original jurisdiction of any part of this case, and order an inventory, to fix — as between these parties — the nature and amount of what was seized from the heir and bought by the creditor, of what — at that time, theft, war and overflows had left of the succession of Michael Dickson ; but we can and do suggest the important necessity of such an inventory, or of some proceeding, to preserve the evidence of what remained of said succession, of what plaintiff may hereafter be entitled to, and of any charges outranking her claim, and which then affected the acquired inheritance.
To establish those facts, the marshal’s seizure, his return and his deed are as insufficient as incorrect.
There remains to be decided whether Mrs. Dickson — as usufructuary —is or is not bound to give security to her children, or to plaintiff, as assignee of the hereditary rights of her daughter ? She is not. Under our Code, fathers and mothers have during their marriage — the enjoyment of the estate of their children. After the dissolution of the marriage, by the death of one of the parties, the survivor — under the statute of the 25th of March, 1844 — has the right to hold in usufruct, during his or her natural life, so much of the share of the deceased in the .community property as may be inherited by the issue of their marriage. In either case, the usufruct so granted to the parents is a legal one, and the Code specially provides: “ that neither the father nor the mother having the legal usufruct of the estate of their children is required to give security.”
R. C. 0. 223, 540, 541, 560.
Acts of 1844, No. 152.
The distinctions between the usufruct conferred by the Oodo, and that conferred by the statute, are plain, palpable distinctions. The first is established on only the estate acquired by the child during his parent’s marriage, and otherwise than by inheritance from them: that one lasts until the majority or emancipation of the child. The other is established on property which — before the Statute of 1844, was not subject to that usufruct, which- — up to 1844 — the parents held as tutor or tutrix, or which passed to the child — when he was of age — free from that charge. That usufruct does not cease at the emancipation or majority of the child, but only when the parent dies or enters into a second marriage. That Statute adds to the rights, not to the obligations of a favored class of usufructuaries.
*753 ’Had Mrs. Trigg retained her title to a share in the community, she could not have required from her moth er — as usufructuary of that share— the security which, on application of Mrs. Trigg’s creditor — her mother was ordered to furnish. That condition is not imposed by the Statute, and it is expressly excluded by the Code. A stranger may acquire the inheritance, the creditor may dispossess the child, but whatever the changes that may happen in the ownership of the property, the parent’s usufruct, until the parent’s death, remains linked to the divested title, to the transferred inheritance.
R. C. C. 617.
It is, therefore, ordered, adjudged and decreed that the judgment of the lower court in favor of Olympe Boisse and against Hannah P. Dickson, be and the same is hereby annulled, avoided and reversed, and this case remanded to be proceeded with — as between said parties— according to law and the foregoing opinion: the costs of the appeal to be paid by Olympe Boisse.
Mr. Justice Egan took no part in the decision.
Mr. Justice Egan having been consulted in regard to the settlement of the succession of Dickson by some of the heirs, to the knowledge of counsel on both sides, reserved the right to recuse himself at any stage of this case at the time it was originally heard, and having taken no part either in the decision already rendered or in granting a rehearing, now recuses himself in this case.